U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 15, 2007**

**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JAMES H. MOORE, III, | § | CASE NO. 06-31859-SGJ-7 |
|     DEBTOR. | § | |
| | § | |
| | § | |
| THE CADLE COMPANY, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 06-3451 |
| | § | |
| JAMES H. MOORE, III, | § | |
|     DEFENDANT. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF JUDGMENT DENYING DISCHARGE OF THE DEBTOR

In this adversary proceeding, the Plaintiff is objecting to the granting of the Debtor's global discharge:  (1) pursuant to section 727(a)(3), on the grounds that the Debtor, without adequate justification, concealed or otherwise failed to keep,

record, or preserve records from which his financial condition or business transactions might be ascertained; (2) pursuant to section 727(a)(4), on the grounds that the Debtor allegedly knowingly and fraudulently made false oaths or accounts with respect to material facts on his bankruptcy Schedules filed with this court; and (3) pursuant to section 727(a)(5), on the grounds that the Debtor failed to explain satisfactorily any loss of assets or deficiency of assets to meet the Debtor's liabilities. The Debtor denies all such allegations. For the reasons set forth below, this court has determined that the Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4) and (5), but not pursuant to 11 U.S.C. § 727(a)(3).

The court presided over a trial of this proceeding on April 18, 19 and 25, 2007.[1] The following constitutes the court's findings of fact and conclusions of law. Any finding of fact that should more properly be deemed a conclusion of law shall be deemed as such, and vice versa.

<u>I.</u>

<u>FINDINGS OF FACT</u>

A. <u>Introduction</u>

---

[1] The Debtor-Defendant filed a Motion to Strike Allegations and Pretrial Order [Doc. No. 31] shortly before trial. The court denied that Motion, overruling the various objections asserted therein, for reasons stated orally on the record on the first day of trial.

1.    This court has jurisdiction over this adversary
proceeding pursuant to 11 U.S.C. § 1334(b).  The adversary
proceeding was timely filed on August 25, 2006.[2]

2.    The adversary proceeding is a core proceeding pursuant
to 28 U.S.C. § 157(b)(2)(J).

3.    Defendant James H. Moore, III ("Debtor" or "Debtor-
Defendant") is an individual who filed a Chapter 7 bankruptcy
case, Case No. 05-34150SGJ-7, on May 2, 2006 (the "Petition
Date").

4.    Plaintiff, The Cadle Company ("Cadle" or "Plaintiff"),
is an Ohio corporation and a large unsecured creditor in the
Debtor's bankruptcy case.  Cadle asserts creditor-status with
regard to the Debtor by virtue of owning and holding two (2)
judgments against Debtor:  (a) an Agreed Judgment against Debtor
in the principal amount of $1,077,602.60, plus pre-judgment
interest, attorney's fees, and post-judgment interest, entered by
the United States District Court, Northern District of Texas,
Dallas Division, on November 11, 1992, in that certain proceeding
styled *FDIC v. James H. Moore, III,* and referenced as Civil

---

[2] The original deadline for complaints objecting to discharge in
this bankruptcy case was July 31, 2006.  On July 12, 2006, this court
entered an Agreed Order Granting Motion to Extend Time to File
Objection to Discharge in the Case, granting the Plaintiff until
August 25, 2006 to file any complaint objecting to the Debtor's
discharge.  [Doc. No. 23].

Action No. 3-92-CV-1214-R (the "Judgment")[3]; and (b) a Final

Default Judgment ("Default Judgment") against Debtor in the

principal amount of $6,723,843.32, as of November 6, 2003, plus

pre-judgment interest, attorneys' fees, and post-judgment

interest, signed by the court on November 25, 2003, in that

certain proceeding styled *The Cadle Company v. Sherman Plaza*

*Joint Venture and James H. Moore, III*, and referenced as Cause

No. 03-06354, pending before the 298th Judicial District Court,

Dallas County, Texas.[4]

     5.   On the Petition Date, the Debtor filed Schedules

(herein so-called) [Pl. Ex. 2] and the Statement of Financial

Affairs ("SOFA") [Pl. Ex. 3] in the bankruptcy case.  The

Schedules indicate that the Debtor has $200,000 of secured debt

and $33,327,065.23 of unsecured debt, including the unsecured

debt owed to Cadle.  Additionally, the Debtor's Schedules list:

(a) no real property owned by the Debtor (the homestead in which

the Debtor and his non-debtor spouse have resided for 28 years,

---

     [3] The Judgment was assigned to Cadle.  Cadle has filed an
amended proof of claim in this bankruptcy case indicating that, as of
the filing date of the case, the amount of $4,018,113.95 was due and
owing to Cadle by Debtor under the Judgment.

     [4] Cadle filed a proof of claim in this bankruptcy case
indicating that, as of the filing date of the bankruptcy case, the
amount of $8,531,343.15 was due and owing to Cadle by Debtor under
the Default Judgment.

4

at 5432 Bent Tree Drive, Dallas, Texas, is purported to be the separate property of Mrs. Moore), and (b) very little personal property owned by the Debtor (just books and pictures valued at $1,000; clothing valued at $1,000; a Rolex watch valued at $4,000; six guns and some golf clubs valued at $5,000; several insurance policies valued at approximately $74,000; an IRA valued at $13,000, and a stock interest in "James H. Moore & Associates, Inc." valued at $0). The SOFA is rather unremarkable, showing, at Question 1, that the Debtor earned a mere $20,000 per year of income (commissions) from employment in each of years 2004 and 2005; $2,000 of income (commissions) in 2006 through the Petition Date; also showing at Question 4, seventeen lawsuits to which the Debtor has been a party over years dating back to 1991 (sixteen of which have resulted in judgments); the Debtor checked "None" on all other questions on the SOFA, except for Question 9 which requires disclosure of payments related to bankruptcy counseling; Question 16 which requires disclosure of a spouse; and Question 19 which requires disclosure of accountants for the Debtor.

6. On August 17, 2006, the Debtor amended his Schedules B and C ("Amended Schedules") [Pl. Ex. 5] and Item 18 of his SOFA ("Amended SOFA") [Pl. Ex. 4].[5] Not much new information was

---

[5] In between the filing of the original Schedules and SOFA and the Amended Schedules and SOFA, the following transpired: on May 30,

disclosed in the Amended Schedules. The Debtor merely elaborated on descriptions and values of exempt and nonexempt guns and golf clubs. The only change made in the Amended SOFA was to change Debtor's answer on Question 18 to disclose four entities in which Debtor was a manager or officer "as of the date of the filing of his bankruptcy:" (a) JHM Properties, Inc. - Manager/Co-President, (b) Rubicon Designs II, Inc. - Manager/Co-President, (c) James H. Moore & Associates, Inc. - President, and (d) High Point Construction and Development - Manager.

B. Profile of the Debtor

7. The Debtor is a sophisticated, educated and mature businessman. Among other things, he has an undergraduate degree in Engineering from Southern Methodist University, a Master's degree from Dallas Theological Seminary, and a real estate license. The Debtor has been engaged in various real estate endeavors since the 1970s, including, at various times, providing real estate brokerage services to, and providing services or having ownership in, certain real estate investment and development companies.

8. Perhaps most relevant to the Debtor's current financial

---

2006, the Debtor's creditors meeting took place pursuant to 11 U.S.C. § 341(a) and, on July 28, 2006, Cadle took an oral deposition of Debtor, pursuant to Bankruptcy Rule 2004.

and legal problems, in the 1980s, the Debtor was involved in certain ventures (sometimes as a partner and sometimes through certain companies with which he was affiliated) that invested in real estate. Ultimately, all of the investments in which he directly or indirectly participated were lost. The Debtor was sued many times by many people, and paid off several of the judgments, but testified he has not had the financial ability to pay Cadle and certain other creditors. The Debtor describes himself as having become insolvent by 1991.

9. The Debtor has been married for 39 years to his non-debtor spouse, Elizabeth Moore, whom the Debtor described as being a "talented interior designer," as having sometimes been involved in the "import business," and having a real estate license. The Debtor testified that sometime in the time range of 1989-1992 (around the same time the Debtor became or was becoming insolvent), Mrs. Moore formed (and does currently and has always owned as separate property) a company called JHM Properties, Inc., of which the Debtor has been an officer since 1991 and is currently "Co-President." The court notes that this company has the same initials ("JHM")as this Debtor. The Debtor has signatory authority on JHM Properties, Inc.'s bank account and the company operates out of the Debtor's residence.

10.   The Debtor also testified that during this same general time frame, after he and his wife sought certain legal or accounting advice, the Debtor and his wife entered into various Agreements to Partition Community Property, which agreements were dated March 31, 1988; December 12, 1988; August 15, 1990; and November 19, 1990.   [Debtor's Exs. 6 & 29].   These agreements appear to explain, to at least some extent, why the Debtor—a man who has been engaged in multi-million real estate deals—seems to have an insignificant amount of property in his own name, see paragraph 5 above, and why the Debtor takes the position that so many of the things in his life (such as JHM Properties, Inc.) are the separate property of his wife of 39 years.

C.   Omissions from Schedules and Amended Schedules–Evidence Relevant to Section 727(a)(4) Claim

11.   The Debtor's employment and business endeavors and, somewhat relatedly, the Debtor's Schedules, Amended Schedules, SOFA, and Amended SOFA, are at the front and center of this adversary proceeding.

12.   With regard to the Debtor's employment and business endeavors, the Debtor described himself, in his Schedule I, as a "Realtor" with JHM Properties, Inc., the company mentioned above that is owned by his non-debtor spouse, earning $1,500 per month. Additionally, the Debtor's Schedule B indicated that the Debtor

owned stock in a corporation called James H. Moore & Associates, Inc. worth $0. As earlier indicated, the Debtor's original SOFA showed that he earned a mere $20,000 per year working for JHM Properties, Inc. in the two calendar years preceding bankruptcy. That was it.

13. One might reasonably infer, from reviewing the original Schedules and SOFA, that this Debtor is, and has been in recent years, scaled down to a rather modest lifestyle and earning capacity, after a roller coaster ride in the real estate business in the 1980s and early 1990s.

14. The only things in the Schedules that might suggest that there was more to the story was that JHM Properties, Inc.-- again, "the Debtor's non-debtor spouse's company"–was listed on Schedule D as having a $200,000 claim against the Debtor secured by "Country Club Memberships" valued at $100,000 (the country club memberships were not disclosed in Schedule B).

15. And the only thing in the SOFA that might have suggested there was more to the story came along in mid-August (three-and-a-half months postpetition) when the Debtor disclosed in the Amended SOFA four entities of which he was an officer or manager as of the Petition Date. See paragraph 6 above.

16. However, the ultimate evidence at trial established the

following significant, relevant information that was not
disclosed in any form or fashion in the Schedules and SOFA or
Amended Schedules and SOFA.

        a.   Income from Employment that the Debtor Did not
Disclose in Question 1 of Original or Amended SOFA or Schedule I
of the Original or Amended Schedules.  The Debtor was party to an
employment agreement dated December 20, 1991, that described
certain commission and draw arrangements between JHM Properties,
Inc. and the Debtor.  Pl. Ex. 20.  The agreement is signed by the
Debtor's spouse, Elizabeth Moore, as Vice President of JHM
Properties, Inc., and by the Debtor.  The agreement provides that
JHM Properties, Inc. "Will pay certain expenses on your behalf
and on behalf of James H. Moore, Inc. . . .  In specific, [JHM
Properties, Inc.] will pay the following expenses," and the
agreement goes on to list membership dues and expenses associated
with the Debtor's or James H. Moore, Inc.'s membership interests
in Bent Tree Country Club, Preston Trail Golf Club, and Country
Club of the Rockies, Inc.  The agreement went on to provide that,
in addition to paying these expenses, JHM Properties, Inc. would
pay the Debtor $3,000 per month as a draw against commissions.
This draw, together with the expenses paid by JHM Properties,
Inc., were required to be repaid by the Debtor, from the
commissions he earned and were otherwise payable to him from JHM
Properties, Inc., along with an 18% return to the company.
Additionally, to "secure repayment of any amount drawn which is
not repayable from earned commissions," the Debtor agreed to give
JHM Properties, Inc. a security interest in the three country
club memberships.  The ultimate evidence was that JHM Properties,
Inc. has paid many of the Debtor's life expenses—thus the reality
does not match up with the December 20, 1991 agreement.  In other
words, JHM Properties, Inc. has paid not merely the Debtor's
three country club expenses, but it has also paid all sorts of
other personal expenses including credit card bills of the Debtor
(or those of his wholly owned corporation, James H. Moore &
Associates, Inc.), alumni contributions, expenses associated with
a club called "The Cleekers," and attorney's fees personally
incurred by the Debtor for such things as defending against
collection efforts of judgment creditors and his bankruptcy
attorney.  Def. Ex. 37 reflected that the Debtor and James H.
Moore & Associates, Inc. received $89,531.24 from JHM Properties,
Inc. in 2004, from combined cash draws and reimbursement of

personal expenses; $103,064.41 from JHM Properties, Inc. in 2005,
from combined cash draws and reimbursement of personal expenses,
and $23,497.85 from JHM Properties, Inc. in 2006, from combined
cash draws and reimbursement of personal expenses.  The court
notes that these amounts are not reported on the Debtor's
personal tax returns as income to him because they are treated
both by him and JHM Properties, Inc. as a "loan" to him and/or
James H. Moore & Associates, Inc. or a "draw" against the
Debtor's commissions.  The Debtor's testimony was that he took
much more out of JHM Properties, Inc. in draws than he earned in
commissions.  For example, between January 1, 2001, and April 26,
2006, the Debtor and/or James H. Moore, Inc. received $631,855.84
in combined cash draws and reimbursement of personal expenses
from JHM Properties, Inc.  Meanwhile, the Debtor testified that
he earned $336,754.57 in commissions for JHM Properties, Inc.
during roughly the same time period (July 2001-late 2005).  Def.
Ex. 36.  The Debtor testified that he received $390,000 more in
draws than commissions from July 2001 through late 2005.  Def.
Ex. 38.  The Debtor testified that it was because his draws
exceeded his commissions by such a large amount (the draws
exceeded commissions by well over $200,000—the amount is not
entirely clear from the evidence) that he and JHM Properties,
Inc. entered into a letter agreement on April 26, 2006 that did
two things: (1) canceled the December 20, 1991 employment
agreement, and (2) provided that the three country club
memberships referenced in the December 20, 1991 employment
agreement, or proceeds therefrom, having an alleged combined
value of $94,500, would be transferred to JHM Properties, Inc.,
pursuant to the security agreement that JHM Properties purported
to have.  Pl. Ex. 19.  See also Pl. Exs 14 & 15.[6]  The court
notes that this April 26, 2006 letter agreement (signed by
Debtor's wife as "Vice President and Sole Shareholder" of JHM
Properties, Inc.) was executed the same date as the Debtor's
Voluntary Petition and original Schedules and SOFA.  Pl. Ex. 2.

_____

[6] The court notes that the security documentation submitted into
evidence is unrecorded and some of it is dated December 1991 and,
assuming it was recorded, the Debtor was nevertheless unsure if it
was ever renewed or continued.  Additionally, while the Debtor
testified that JHM Properties, Inc. took a deed in lieu of
foreclosure with regard to the country club memberships, there was no
documentation submitted for this and this is inconsistent with the
Debtor indicating on his Schedule D that JHM Properties, Inc. was a
secured creditor with a collateral interest in the three country club
memberships.

11

One last nondisclosure in the Schedules/SOFA relevant to undisclosed income is that an entity known as High Point Construction and Development, of which the Debtor is a Manager[7] (although not disclosed in Debtor's original Schedules or SOFA), and which entity, according to the Debtor's testimony, works on "infrastructure for developments and owns some equipment," provides to Debtor a car—a 2002 Cadillac Escalade (which High Point Construction and Development owns and Debtor drives). This entity also provides to the Debtor health insurance and a cell phone. Again, none of this was listed in Question 1 of the Debtor SOFA or Amended SOFA and the Debtor provided no explanation of why not.

b. Business Entities not Disclosed in Question 18 of SOFA or Anywhere Else in Schedules and SOFAs. As earlier mentioned, in Question 18 of the Debtor's SOFA, which requires disclosure of "names, addresses, taxpayer identification numbers, nature of businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executor, partner in a partnership, sole proprietor, or was self-employed . . . within six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more . . . within six years immediately preceding the commencement of the case," the Debtor, in his original Schedules, checked "None"—thus indicating he was not an owner, director, and had no 5%-or-more interests in any businesses in the six years before May 2, 2006. Then, after the first meeting of creditors, and after a Rule 2004 Examination by the Plaintiff, when information came out about certain entities with which the Debtor had extensive involvement, the Debtor amended Question 18 of his SOFA, as follows:

"Question 18 of the Statement of Financial Affairs is amended as follows:

James H. Moore, III, as of the date of the filing of his bankruptcy, was a manager or officer of the following four companies:

     JHM Properties, Inc.      Manager/Co-

---

[7] Debtor's wife owns 35% of this company through her wholly owned company Rubicon Designs II, Inc., once again allegedly her separate property, but Debtor purports to own none of this company.

President.[8]

| | |
|---|---|
| Rubicon Designs II, Inc. | Manager/Co-President[9] |
| James H. Moore & Associates, Inc. | President[10] |
| High Point Construction and Development | Manager[11] |

First of all, it should be noted that much of the required information such as "taxpayer identification numbers, nature of businesses, and beginning and ending dates of all businesses" was omitted. Second of all, it should be noted that the information provided is "as of the date of the filing of the petition"—rather than going back "within six years immediately preceding the commencement of the case" as required. Finally, if it were not troubling enough that this information was not disclosed in the original Schedules (but, rather, was provided three-and-one-half months postpetition after the first meeting of creditors and a Rule 2004 examination), it becomes even more troubling that several entities that should have been disclosed

_____

[8] Although not disclosed in the Amended SOFA, testimony indicated that this is a real estate brokerage and design firm. Most of the evidence shows that Debtor's wife is the Vice President and Debtor is President, Pl. Ex. 64, 65, & 66, although Debtor testified they are both "Co-Presidents." The Debtor can sign on bank accounts for this entity. The Debtor does not know how much his wife earned from this entity in recent years.

[9] Although not disclosed in the Amended SOFA, this is primarily a service company and owns some equipment. The Debtor testified that his wife is Co-President (although he does not know if any documents to verify that). The Debtor can sign on bank accounts for this entity.

[10] This entity was disclosed in Debtor's original Schedule B as an entity he 100% owned (and as worthless). The debtor testified that the nature of the business was landscaping. Debtor testified it may have been a dba for a Richmond Construction at one time, or vice versa.

[11] The Debtor testified that this entity was involved with infrastructure for developments and it owned some equipment. One of its members was Rubicon Designs.

13

by the Debtor were never disclosed at all (not even in the Amended SOFA). The following entities were not listed but, it appears, should have been listed in SOFA Question # 18:

| | |
|---|---|
| Brunswick Homes, LLC | Debtor was Manager from 1997-Dec. 2005; this entity, which built homes, was 50% owned by JHM Properties, Inc. |
| McKinney Meadows, LP | Debtor was Manager of the General Partner, High Point Construction and Development, LLC. Its address is Debtor's home address and its business is real estate acquisition. It was formed in 2005. |
| MJ Operating Co. | Debtor was Director; formed in March 2006—just before the bankruptcy case. This entity was a general partner for a real estate development near Denton, TX called Stone Mountain. |
| Richmond Construction | Debtor was a Manager from about 2003-forward. |
| Richmond Farms, LLC | Debtor was a Manager from 1999-2003; entity was 100% owned By Brunswick Homes, LLC—the later |

14

of which Debtor was
the Manager from
1997-December 2005.

In summary, there were at least **nine entities** that
should have been disclosed but were not disclosed in the Debtor's
original SOFA Question # 18. **Four of these entities were
disclosed three-and-one-half months postpetition**, in the Amended
SOFA, after questioning at the first meeting of creditors and a
Rule 2004 examination (although not all required information,
such as taxpayer identification number and nature of the
business, was disclosed regarding these entities), and **five
additional entities were never disclosed in the SOFA or
Schedules**. Finally, it seems somewhat noteworthy that certain
additional entities to which the Debtor had **close connections**
were not disclosed in the Schedules or SOFA (as amended). For
example, the Debtor never disclosed in his SOFA or Schedules an
Altoga 98, LP, which was 49% owned by Debtor's wife and the 1%
general partner of which was Rubicon Designs II, Inc. (the latter
of which Debtor was Manager/Co-President). The Debtor also never
disclosed Horseshoe Nail Ranch, LP. With regard to the latter,
the Debtor testified that James H. Moore & Associates, Inc. was a
Manager. However, Pl. Ex. 63 (a December 2003 Memo) showed the
Debtor signing himself personally as Manager. Moreover, Pl. Ex.
54 was a May 22, 2002 Promissory Note in the amount of $500,000
in which James H. Moore & Associates, Inc. is shown as a lender
to Horseshoe Nail Ranch, LP, the collateral for which note
appears to be property in Denton, Texas. The Debtor testified
that the note was assigned to Brunswick Homes (of which he was
Manager until December 2005), with which he is no longer
associated. However, the assignment was not submitted into
evidence. No one seems to know where it is. Interestingly, Pl.
Ex. 56—which is a docket sheet from the bankruptcy case of
Horseshoe Nail Ranch, LP[12]—shows that James H. Moore &
Associates, LP, again, the Debtor's wholly owned company which
Debtor listed in his Schedules as have $0 of value, has appeared
in the case (postpetition during the Debtor's case) as a creditor
(which makes no sense if the $500,000 promissory note was
assigned to Brunswick Homes). Pl. Ex. 56, at p. 5, DE# 23.

---

[12] Horseshoe Nail Ranch, L.P. is a Chapter 11 debtor in Case No.
06-41566, filed September 22, 2006, in the United States Bankruptcy
Court for the Eastern District of Texas .

c. <u>Transfers Not Disclosed in SOFA or Amended SOFA.</u>
Question 10 on the SOFA requires disclosure of property
transferred by a debtor, other than in the ordinary course of
business or financial affairs of the debtor, within two years
immediately preceding the commencement of the bankruptcy case.
The evidence submitted indicated that at least two transfers
by the Debtor were not disclosed in the SOFA or Amended SOFA that
should have been. First, as previously mentioned, the Debtor
testified that he transferred his three country club memberships
(or proceeds from the sale therefrom), the value of which was
nearly $100,000, to his "wife's company" JHM Properties, Inc., on
April 26, 2006—less than a week before the Petition Date—through
the mechanism of a deed in lieu of foreclosure (which was not
produced). This transfer does not appear in Question 10 of the
SOFA. In fact, the Debtor's Schedule D is inconsistent with this
testimony. Second, in December 2004, the Debtor sold a 1999
Cadillac Escalade that he owned. The Debtor testified he sold it
for $9,500 to an individual who is not an insider, and used the
sale proceeds to live on, but has no record of this. This does
not appear in Question 10 of the SOFA. Finally, Pl. Exs. 23-25
are cashier's checks made out to the Debtor in the aggregate
amount of $50,000, dated March 28 2005, April 7, 2005, and May
20, 2005, that the Debtor testified constituted the proceeds of a
sale of a Tiffany glass to an art dealer, which Tiffany glass was
allegedly owned by JHM Properties, Inc. (again, his "wife's"
wholly owned company that offices out of the Debtor's residence).
The Debtor had no explanation for why the checks were made
payable to him and not JHM Properties, Inc. This transfer does
not appear in Question 10 of the SOFA. The Debtor argues it was
not required to be disclosed because the Tiffany glass was not
his and he did not use the funds personally. This explanation is
highly suspect to the court since the cashier's checks were made
payable to the Debtor.


d. <u>Property Held or Controlled by Debtor for Another.</u>
Question 14 of the SOFA requires debtors to list all property
owned by another person that the debtor holds or controls.
Similarly, Item 20 on the Schedules requires disclosure of any
interest in a trust. The Debtor disclosed nothing in his
original and Amended Schedules and SOFAs on these two items. The
evidence revealed that the Debtor is a Trustee of the so called
Moore Family Trust. Pl. Ex. 10. It was set up many years ago
(1979) and the Debtor seemed fuzzy on whether there remained

anything in it other than IRAs already disclosed on his
Schedules.  Nevertheless it was not disclosed.  The evidence also
indicated that the Debtor has check signing authority on checking
accounts of various business entities:  JHM Properties, Inc.
(again, allegedly 100% Debtor's wife' separate property), Rubicon
Designs II, Inc. (again, allegedly 100% Debtor's wife's separate
property), and High Point Construction and Development (again,
allegedly 35% owned by Rubicon).  The Debtor has maintained no
personal bank account since 2003 (his wife has one but he does
not).  Given that these entities are closely held entities (one
of which—JHM Properties, Inc.—is paying many of Debtor's life
expenses) this court believes these accounts should have been
disclosed at Question 14 of the Debtor's Schedules.

## D.  Unsatisfactory Explanations Regarding Loss of Assets—Evidence Relevant to Section 727(a)(5) Claims

17.  Section 727(a)(5) provides that it is grounds to deny a
discharge if the Debtor fails to satisfactorily explain any loss
of assets.  The ultimate evidence at trial established the
following relevant information regarding loss of assets that the
Debtor did not explain satisfactorily.  First, as previously
mentioned, the Debtor testified that he transferred his three
country club memberships (or proceeds from the sale therefrom),
the value of which was nearly $100,000, to his wife's company JHM
Properties, Inc., on April 26, 2006—less than a week before the
Petition Date—through the mechanism of a deed in lieu of
foreclosure (which was not produced).  This transfer not only did
not appear in Question 10 of the SOFA, but the Debtor has
produced no documentation to explain satisfactorily what
precisely happened (nor why his Schedule D, but not his Schedule

17

B, suggests that the Debtor still has an interest in the country club memberships). Second, as previously mentioned, in December 2004, the Debtor sold a 1999 Cadillac Escalade that he owned. The Debtor testified he sold it for $9,500 to an individual who is not an insider, and used the sale proceeds to live on, but has no record of this. This transfer did not appear in Question 10 of the SOFA and only came out in postpetition discovery. Additionally, as previously mentioned, Pl. Exs. 23-25 are cashier's checks made out to the Debtor in the aggregate amount of $50,000, dated March 28 2005, April 7, 2005, and May 20, 2005, that the Debtor testified constituted the proceeds of a sale of a Tiffany glass to an art dealer, which Tiffany glass was allegedly owned by JHM Properties, Inc. (again, his wife's wholly owned company that offices out of the Debtor's residence). The Debtor had no explanation for why the checks were made payable to him and not JHM Properties, Inc. This transfer does not appear in Question 10 of the SOFA. The Debtor argues it was not required to be disclosed because the Tiffany glass was not his and he did not use the funds personally. This explanation is highly suspect to the court, since the cashier's checks were made payable to the Debtor. Finally, as previously mentioned, the Debtor, through his wholly owned and allegedly worthless company James H. Moore &

18

Associates, Inc., has appeared as a creditor recently in the bankruptcy case of Horseshoe Nail Ranch LP—of which Debtor was either personally a Manager or James H. Associates, Inc. was a Manager. Pl. Exs. 56 & 63. The evidence reflected a May 22, 2002 $500,000 Promissory Note from James H. Moore & Associates, Inc. (as lender) to Horseshoe Nail Ranch LP (as borrower). Although this note was allegedly assigned to Brunswick Homes (the entity Debtor managed from 1997-December 2005), the assignment was not produced and seems inconsistent with the Debtor/James H. Moore & Associates, Inc. appearing as a creditor in the Horseshoe Nail Ranch LP bankruptcy case. There is no satisfactory explanation for this offered by the Debtor.

18. Finally, in fairness to the Debtor, it should be noted that the Debtor did produce a fair amount of documents. Debtor produced he and his wife's joint tax returns for 2002-2005. Def. Ex. 11. He also produced JHM Properties, Inc.'s tax returns for 2002-2005. Def. Exs. 39-42. He also produced, among other things, JHM Properties, Inc.'s Profit and Loss Statements, Def. Exs. 43-46. He also produced marital partition agreements, trust documents, information regarding IRAs, and numerous checks.

19. Yet, in fairness to the Plaintiff, it brought up many other issues at trial (*e.g.,* the Debtor's allegedly inadequate

descriptions of IRAs; failure to disclose a safe deposit box controlled by the Debtor; other entities with which the Debtor was associated, not otherwise discussed herein) that the court has not addressed herein, since the court did not think these issues rose to the level of warranting discussion.

CONCLUSIONS OF LAW

Section 727(a)(4) Claims

A.  As many courts have opined, Schedules and SOFAs serve a vital role for creditors in bankruptcy cases in that they ensure that adequate and truthful information is available to trustees and creditors, not just an objecting creditor, without the need for further investigation to determine whether or not the information is true and correct.  *E.g., Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 177-178 (5th Cir. 1992).  To bar the Debtor's discharge under Section 727(a)(4), Cadle has the burden of proving that:  (1) the Debtor made a statement under oath; (2) the statement was false; (3) the Debtor knew the statement was false; (4) the Debtor made the statement with fraudulent intent to deceive; and (5) the statement related materially to the bankruptcy case.  *Id.* at 178.

B.  The evidence is rather clear that this Debtor's original and Amended Schedules and SOFAs did not contain a

20

substantial amount of information that the Debtor should have disclosed. For example, significant income (essentially) the Debtor receives from JHM Properties, Inc. (regular reimbursement of his life expenses) and High Point Construction and Development, LLC (car, cell phone, health insurance); at least nine entities he is or has recently been an officer of; transfers of property (country club memberships, car, Tiffany glass), and property he controls (through the Moore Family Trust and the various bank accounts of entities allegedly owned as separate property by his wife). The court concludes that these numerous omissions rise to the level of requiring denial of the Debtor's discharge under 727(a)(4), as the court believes the omissions are the equivalent of false statements made under oath, the Debtor most assuredly knew the statements were false, he had a fraudulent intent to deceive (or at least reckless disregard for the truth),[13] and the statements were material.

C. This court has indicated in earlier opinions that it does not take a mechanical approach to Section 727(a)(4) analyses. *U. S. Trustee v. Hughes,* 353 B.R. 486, 505 (Bankr. N.D. Tex. 2006). In other words, this court does not believe it is appropriate to tally up mistakes and omissions in Schedules

---

[13] *See The Cadle Co. v. Mitchell (In re Mitchell),* 102 Fed. Appx. 860, 862-863 (5th Cir. 2004).

and SOFAs and, if a debtor has committed some magic number of
transgressions, then fraudulent intent to deceive will be
inferred and the debtor's discharge should be denied. Instead,
this court finds the approach taken by Judge Hale in *The Cadle
Co. v. Guenther (In re Guenther)*, 333 B.R. 759 (Bankr. N.D. Tex.
2005) a little more persuasive. *Id.* at 767-68 (noting that it
may be close to impossible to produce Schedules and SOFAs
containing no mistakes, but opining that debtors who make more
than one falsehood under oath, combined with a pattern of other
activity suggesting fraudulent intent, at some point cross a
threshold). This court believes that courts must be more
circumspect than simply adding up mistakes. Courts must consider
not just the number of mistakes, but the type and significance of
mistakes, the sophistication and overall attitude and approach of
the debtor, and sometimes other facts and circumstances that
might be relevant to discern the debtor's state of mind.

D. Here, this Debtor does not deserve the privilege of a
discharge. The omissions on the Schedules are just too numerous
and significant to ignore. The facts of this case present
serious omissions that have to be construed to indicate, at
minimum, a reckless disregard for the truth.

The Defense of Throwing the Lawyer Under the Bus

E. The Debtor has blamed the omissions from his Schedules and SOFAs on his bankruptcy attorney and imprecise instructions or advice given to him by his bankruptcy attorney. With regard to the "draws" or income from JHM Properties, Inc. not disclosed in Question 1 of his SOFAs, the Debtor also added that James H. Moore & Associates, Inc. (his wholly owned company) has an agreement with the Debtor whereby it received much or all of the income from JHM Properties, Inc. and there was "not enough space" to describe all this.

F. The court does not find these explanations compelling to overcome the court's overwhelming conviction that there has been knowing and fraudulent omissions by the Debtor in completing his Schedules and SOFAs.

G. While it is possible in certain circumstances for a Debtor to have a credible defense that he relied on counsel in making mistakes in the Schedules and SOFAs, the defense has to be reasonable and in good faith. *E.g., Gebhardt v. Gartner (In re Gartner),* 326 B.R. 357, 374 (Bankr. S.D. Tex. 2005). The reasonableness of the reliance is undermined where the Debtor has admitted under oath having read and signed the Schedules and SOFAs that are challenged. *Id.* Here the Debtor did admit to reading and signing the Schedules and SOFAs. The Debtor is an

educated, sophisticated, mature man. He has been a manager of numerous companies and handles complex transactions. The omissions from the original and Amended Schedules and SOFAs were many. This court does not find "blaming it on the lawyer" here credible, reasonable, or a good faith defense.

The Defense of "Cadle Knew"

H. The Debtor has also argued that Cadle has been in litigation with the Debtor for many years and any omissions in the Schedules and SOFAs were or should have been known to Cadle, from all the discovery they have undertaken. This defense merits little discussion. Among other reasons, there is roughly $33 million worth of unsecured indebtedness scheduled by the Debtor in this case. This is not just about Cadle. This is about the integrity of the bankruptcy process and every party-in-interest's right to complete information.

Section 727(a)(5) Claims

I. The Debtor has unsatisfactory explained the loss of assets, as set forth in paragraph 17 above. The objecting party has the burden of proving the objection initially, but once the objecting party has produced evidence establishing a basis for

objection (as Cadle has done here), the burden shifts to the debtor to explain the loss satisfactorily. *E.g. In re Reed,* 700 F.2d 986, 992-93 (5th Cir. 1983); *Chalik v. Moorefield*, 748 F.2d 616, 619 (11th Cir. 1984). To be satisfactory, the explanation must convince the judge. Vague and indefinite explanations uncorroborated by documentation are unsatisfactory. *Id.*

    J.   Vague and indefinite explanations uncorroborated by documentation is precisely what we have here, with regard to the transfers described in paragraph 17 above. Accordingly, there is an additional basis to deny the Debtor's discharge.

## Section 727(a)(3) Claims

    K.   The court concludes there are no grounds to deny the Debtor's discharge pursuant to Section 727(a)(3). *See* paragraph 18 above. Generally the Debtor has produced a significant amount of recorded information, as it has been requested by Plaintiff.

## CONCLUSION

    The court will enter a Judgment consistent with this ruling. The court reserves the right to make further findings of fact and conclusions of law.

###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###

25